# EXHIBIT A

## UNITED STATES OF AMERICA
## CONSUMER FINANCIAL PROTECTION BUREAU

ADMINISTRATIVE PROCEEDING

File No. 2017-CFPB-0014

In the Matter of:

**FAY SERVICING, LLC**

**CONSENT ORDER**

 

The Consumer Financial Protection Bureau (Bureau) has reviewed the mortgage servicing practices of Fay Servicing, LLC (Respondent, as defined below), specifically related to its handling of loss-mitigation applications and its implementation of foreclosure protections required to be afforded to borrowers engaged in the loss-mitigation process, and has identified the following law violations. Respondent violated the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. 2601, *et seq.*, its implementing regulation, Regulation X, 12 C.F.R. part 1024, and the Consumer Financial Protection Act of 2010 (CFPA) as follows: Respondent took prohibited foreclosure actions against certain borrowers, in violation of 12 C.F.R. § 1024.41(f)(2) and (g); Respondent failed to have policies and procedures reasonably designed to provide required foreclosure protections in compliance with applicable law, in violation of 12 C.F.R. § 1024.38(a) and (b)(1)(v); Respondent failed to send or timely send acknowledgment notices to numerous borrowers, in violation of 12 C.F.R. § 1024.41(b)(2)(i)(B); Respondent failed to state in the acknowledgment notices the additional documents and information needed from borrowers to make their loss-

1

mitigation applications complete, in violation of 12 C.F.R. § 1024.41(b)(2)(i)(B);

Respondent failed to have policies and procedures reasonably designed to facilitate

compliance with the acknowledgment notice requirement under 12 C.F.R.

§ 1024.41(b)(2)(i)(B), in violation of 12 C.F.R. § 1024.38(a) and (b)(2)(iv); Respondent

failed to send or timely send evaluation notices to numerous borrowers, in violation of

12 C.F.R. § 1024.41(c)(1); Respondent failed to correctly advise numerous borrowers of

their appeal rights in evaluation notices, in violation of 12 C.F.R. § 1024.41(c)(1); and

Respondent failed to have policies and procedures reasonably designed to properly

evaluate borrowers for loss-mitigation options in accordance with 12 C.F.R. § 1024.41, in

violation of 12 C.F.R. § 1024.38(a) and (b)(2)(v). Under Sections 1053 and 1055 of the

CFPA, 12 U.S.C. §§ 5563, 5565, the Bureau issues this Consent Order (Consent Order).

# I
# Overview

1.    When the financial crisis erupted many mortgage servicers were ill-equipped to

handle the high volumes of delinquent mortgages and loan modification requests

they were required to process. There were pervasive problems with servicers'

ability to process borrowers' applications for relief related to their mortgages, a

process generally known as loss-mitigation. Servicers' problematic practices in

loss-mitigation included lost documents, non-responsiveness, and unwillingness

to work with borrowers to reach agreements on options that would allow

borrowers to avoid foreclosures. In response, the Bureau published rules, which

became effective on January 10, 2014, that, among other things, serve as national

mortgage servicing standards (the Mortgage Servicing Rules). Among the

borrower protections provided by the Mortgage Servicing Rules is a full and fair

opportunity to be evaluated for options that allow borrowers to avoid the harms associated with foreclosures.

2.  Among other things, the Mortgage Servicing Rules require mortgage servicers that offer loss-mitigation options to implement loss-mitigation processes that (i) respond timely to borrowers, (ii) inform borrowers of the documents and information they must provide to be evaluated for alternatives to foreclosure, (iii) inform borrowers of the results of the evaluation of their applications, and (iv) provide foreclosure protections to borrowers who reach certain points in the loss-mitigation process. Respondent's loss-mitigation processes failed to provide certain borrowers with these rights and protections to which they were entitled.

## II
### Jurisdiction

3.  The Bureau has jurisdiction over this matter under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565, the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. 2601, *et seq.*, and its implementing regulation, Regulation X, 12 C.F.R. part 1024.

## III
### Stipulation

4.  Respondent has executed a "Stipulation and Consent to the Issuance of a Consent Order," dated June 5, 2017 (Stipulation), which is incorporated by reference and is accepted by the Bureau. By this Stipulation, Respondent has consented to the issuance of this Consent Order by the Bureau under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565, without admitting or denying any of the

findings of fact or conclusion of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondent and the subject matter of this action.

## IV
## Definitions

5.  The following definitions apply to this Consent Order:

    a.  "Acknowledgment Notice" means, as required by 12 C.F.R. § 1024.41(b)(2)(i)(B), the written notice servicers must send to a borrower within 5 days (excluding legal public holidays, Saturdays, and Sundays) after receiving a Loss-Mitigation Application 45 days or more before a foreclosure sale. The notice indicates the servicer acknowledges receipt of the Loss-Mitigation Application and states that the servicer has determined that the Loss-Mitigation Application is either complete or incomplete. If a Loss-Mitigation Application is incomplete, the notice must state the additional documents and information the borrower must submit to make the Loss-Mitigation Application complete and the applicable date pursuant to 12 C.F.R. §1024.41(b)(2)(ii).

    b.  "Affected Consumer" means a borrower who was subjected to any of the following actions, as defined below: Foreclosure Violation, Untimely Evaluation Notice, No Evaluation Notice, Untimely Acknowledgment Notice, or No Acknowledgment Notice.

    c.  "Board" means the duly-elected and acting Board of Directors of Fay Financial LLC.

    d.  "Effective Date" means the date on which the Consent Order is issued.

4

e. "Evaluation Notice" means, as required by 12 C.F.R. § 1024.41(c)(1)(ii), the
   written notice servicers must send to a borrower within 30 days of receiving a
   complete Loss-Mitigation Application if the complete Loss-Mitigation
   Application was received more than 37 days before a foreclosure sale. The
   notice states the servicer's determination of which Loss-Mitigation Options, if
   any, it will offer to the borrower on behalf of the owner or assignee of the
   mortgage.

f. "First Filing" means, as set forth in 12 C.F.R. § 1024.41, the first notice or
   filing required by applicable law for any judicial or non-judicial foreclosure
   process.

g. "Foreclosure Violation" means an instance in which Respondent took one of
   the following actions in violation of 12 C.F.R. § 1024.41 against a borrower
   entitled to foreclosure protections under 12 C.F.R. § 1024.41:

   i.    making a First Filing;
   ii.   Moving for Judgment; or
   iii.  conducting a foreclosure sale.

h. "Loss-Mitigation Application" means, as set forth in 12 C.F.R. § 1024.31, an
   oral or written request for a Loss-Mitigation Option that is accompanied by
   any information required by a servicer for evaluation for a Loss-Mitigation
   Option.

i. "Loss-Mitigation Option" means, as set forth in 12 C.F.R. § 1024.31, an
   alternative to foreclosure offered by the owner or assignee of a mortgage loan
   that is made available through the servicer to the borrower.

5

j.  "Moving for Judgment" means, as set forth in 12 C.F.R. § 1024.41, a servicer's moving for foreclosure judgment or order of sale, including making a dispositive motion for foreclosure judgment such as a motion for default judgment, judgment on the pleadings, or summary judgment, which may directly result in a judgment of foreclosure or order of sale. With respect to borrowers for whom Respondent did not maintain a record of such motions, the term includes the entry of a foreclosure judgment. In non-judicial foreclosure proceedings, the term includes the sending, recording, posting, or publishing of the notice of sale, except in cases where sending, recording, posting, or publishing of the notice of sale is the First Filing.

k.  "No Acknowledgment Notice" means the borrower was entitled to receive an Acknowledgment Notice under 12 C.F.R. § 1024.41(b)(2)(i)(B), but Respondent failed to send the borrower an Acknowledgment Notice.

l.  "No Evaluation Notice" means the borrower was entitled to receive an Evaluation Notice under 12 C.F.R. § 1024.41(c)(1)(ii), but Respondent failed to send the borrower an Evaluation Notice.

m.  "Non-Retention Application" means a Loss-Mitigation Application submitted by a borrower who indicated a preference for a Loss-Mitigation Option that would allow the borrower to leave his or her home.

n.  "Regional Director" means the Regional Director for the Midwest Region for the Office of Supervision Examinations for the Consumer Financial Protection Bureau, or his/her delegate.

o.  "Relevant Period" includes the period from January 10, 2014 to the Effective Date.

6

p.  "Respondent" means Fay Servicing, LLC and its successors and assigns.  Fay

Servicing, LLC is a wholly-owned subsidiary of Fay Financial, LLC.

q.  "Retention Application" means a Loss-Mitigation Application submitted by a

borrower who indicated a preference for a Loss-Mitigation Option that would

allow the borrower to stay in his or her home, or did not indicate a preference

for a particular type of Loss-Mitigation Option.

r.  "Untimely Acknowledgment Notice" means the borrower was entitled to

receive an Acknowledgment Notice under 12 C.F.R. § 1024.41(b)(2)(i)(B), but

Respondent failed to send the borrower an Acknowledgment Notice within 5

days (excluding legal public holidays, Saturdays, and Sundays) after receiving

the Loss-Mitigation Application.

s.  "Untimely Evaluation Notice" means the borrower was entitled to receive an

Evaluation Notice under 12 C.F.R. § 1024.41(c)(1)(ii), but Respondent failed

to send the borrower an Evaluation Notice within 30 days of receiving the

complete Loss-Mitigation Application.

## V
## Bureau Findings and Conclusions

The Bureau finds the following:

6.  Respondent is a residential mortgage servicer. Servicing mortgage loans is a

"financial product or service,"[1] and therefore, is a "consumer financial product or

service" under the CFPA.[2]

---

[1] 12 U.S.C. § 5481(15)(A)(i).
[2] 12 U.S.C. § 5481(5).

7.     Respondent is therefore a "covered person" as that term is defined in 12 U.S.C. §
       5481(6).

8.     The Mortgage Servicing Rules require a servicer offering Loss-Mitigation Options
       to borrowers to engage and communicate with those borrowers in a manner that
       gives them a full and fair opportunity to be timely evaluated for loan
       modifications or other alternatives to foreclosure. The Mortgage Servicing Rules
       also prohibit servicers from taking certain foreclosure actions against borrowers
       who have reached specific points in the loss-mitigation process. These
       protections can afford both the servicer and the borrower the opportunity to
       determine in a timely manner whether alternatives to foreclosures are viable, and
       after evaluation, the borrower knows the alternatives to foreclosure he or she is
       being offered, if any, and can then make the right decision for himself or herself.
       Without these protections, a borrower may lose his or her home that he or she
       could have retained, or be subject to a foreclosure that could have been avoided
       through an alternative to foreclosure available through the servicer.

9.     Under the Mortgage Servicing Rules (and subject to certain exceptions), a
       servicer is required to send two different written notices to a borrower engaged in
       the loss-mitigation process. First, a servicer is obligated to send an
       Acknowledgment Notice that, among other things, advises a borrower of the
       additional information that the servicer still needs from the borrower to make the
       Loss-Mitigation Application complete before it can be evaluated for the available
       alternatives to foreclosure. Once the borrower timely submits all of the
       information the servicer requires from the borrower in evaluating an application

for Loss-Mitigation Options, the borrower's Loss-Mitigation Application is complete, and the borrower is protected from certain foreclosure actions.

10.    By requiring the servicer to send an Acknowledgment Notice, among other provisions, the Mortgage Servicing Rules ensure the servicer conducts an adequate up-front review of the Loss-Mitigation Application to identify the missing information and documents, and avoids an unnecessarily prolonged loss-mitigation process by timely notifying the borrower of what needs to be submitted to make the Loss-Mitigation Application complete before it can be evaluated.

11.    Second, a servicer is obligated to send an Evaluation Notice that, among other things, advises a borrower of the Loss-Mitigation Option, if any, being offered, the deadline by which the borrower must accept or reject the offered Loss-Mitigation Option, the borrower's rights to appeal the servicer's evaluation, if applicable, and the reason the borrower is denied for any available loan-modification option, if applicable. The deadlines set forth in the Evaluation Notice also can determine, in part, the period during which the borrower is entitled to continued foreclosure protections.

12.    Since January 10, 2014, Respondent in numerous instances did not adequately and promptly respond to borrowers engaged in the loss-mitigation process by failing to send or timely send Acknowledgment or Evaluation Notices, and in certain instances took prohibited foreclosure actions against borrowers who timely submitted complete Loss-Mitigation Applications and were entitled to foreclosure protections under the Mortgage Servicing Rules.

13. Respondent's failures to comply with the Mortgage Servicing Rules were, in part, the result of Respondent's policies and procedures that provided no guidance or incorrectly instructed personnel about how to handle Loss-Mitigation Applications and complete Loss-Mitigation Applications, and when to provide foreclosure protections to borrowers. In certain instances, these failures were the result of Respondent not having any policies and procedures in place to ensure compliance with the Mortgage Servicing Rules. In other instances, these failures were the results of its mistaken understanding that Regulation X only applies to Retention Applications and not to Non-Retention Applications. The Mortgage Servicing Rules do not distinguish between Retention Applications and Non-Retention Applications. In general, the same requirements and protections apply regardless of whether a borrower indicated a preference in a Loss-Mitigation Application to retain the home.

### Findings and Conclusions as to Respondent's Prohibited Foreclosure Actions

14. Respondent took prohibited foreclosure actions against some borrowers who were entitled to foreclosure protections under the Mortgage Servicing Rules.

15. Regulation X generally protects a borrower who has submitted a complete Loss-Mitigation Application from certain foreclosure activities from the date the borrower submits a complete Loss-Mitigation Application through the determination of whether an alternative to foreclosure is viable and while the parties are working toward such an alternative, unless one of the circumstances specified in 12 C.F. R. § 1024.41(f)(2) or (g) is met.

16. During this period, Regulation X prohibits a servicer from:

a. making the First Filing, if the borrower submits the complete Loss-Mitigation Application prior to the servicer making the First Filing;

b. Moving for Judgment, if the borrower submits the complete Loss-Mitigation Application after the servicer made the First Filing but more than 37 days before a foreclosure sale; and

c. conducting a foreclosure sale, if the borrower submits the complete Loss-Mitigation Application after the servicer made the First Filing but more than 37 days before a foreclosure sale.[3]

17.  Regulation X requires these foreclosure protections to remain in place until:

a. the servicer sends an Evaluation Notice advising the borrower that he or she is not eligible for any Loss-Mitigation Options and the appeal period in 12 C.F.R. § 1024.41(h) is not applicable, the borrower has not requested an appeal within the applicable time period for requesting an appeal, or the borrower's appeal has been denied;

b. the borrower rejects all Loss-Mitigation Options offered by the servicer; or

c. the borrower fails to perform under an agreement on a Loss-Mitigation Option.[4]

18.  These protections apply to all complete Loss-Mitigation Applications, regardless of whether the borrower indicated a preference for a Loss-Mitigation Option that allows him or her to retain the home.

19.  Since January 10, 2014, Respondent made First Filings, moved for foreclosure judgment or an order of sale, and conducted foreclosure sales in certain instances

---

[3] 12 C.F.R. § 1024.41(f)(2), (g).
[4] 12 C.F.R. § 1024.41(f)(2)(i)-(iii), (g)(1)-(3).

where the borrower was entitled to protection from these actions under Regulation X.[5]

20. Respondent took these prohibited foreclosure actions, in part, because it did not have foreclosure policies and procedures in place to ensure compliance with the Mortgage Servicing Rules during certain periods, and, even when it later implemented foreclosure policies and procedures that were supposed to address compliance with the Mortgage Servicing Rules, they incorrectly instructed its personnel about when to provide foreclosure protections to borrowers.

21. Regulation X requires servicers to have policies and procedures reasonably designed to ensure that servicers can "[s]ubmit documents or filings required for a foreclosure process, including documents or filings required by a court of competent jurisdiction, that reflect accurate and current information and that comply with applicable law."[6]

22. For Retention Applications, Respondent's policies instructed personnel to place a foreclosure hold only if a complete Loss-Mitigation Application was received 42 days or more before a scheduled foreclosure sale, instead of complying with the Mortgage Servicing Rules mandate of providing foreclosure protections if a First Filing had not yet occurred or if the complete Loss-Mitigation Application was received more than 37 days before a scheduled foreclosure sale.[7]

23. If after evaluating a complete Retention Application Respondent determined that a borrower only qualified for a non-retention option or denied the borrower all

---

[5] 12 C.F.R. § 1024.41(f)(2), (g).
[6] 12 C.F.R. § 1024.38(b)(1)(v).
[7] 12 C.F.R. § 1024.41(f)(2), (g).

available options, Respondent's policies instructed personnel to lift any

foreclosure holds that were in place. But the Mortgage Servicing Rules mandate

that the servicer continue to afford the borrower foreclosure protections until the

appeal period or process ends, if applicable, all offered Loss-Mitigation Options

are rejected, or the borrower fails to perform under the accepted Loss-Mitigation

Option agreement.[8]

24.    After the Respondent implemented foreclosure policies and procedures that were

supposed to address compliance with the Mortgage Servicing Rules, those

policies and procedures addressed only complete Retention Applications; they

did not address foreclosure protections for borrowers who submitted complete

Non-Retention Applications.

25.    The Mortgage Servicing Rules and Bureau commentary make explicitly clear,

however, that Regulation X's foreclosure protections apply to all Loss-Mitigation

Applications regardless if the borrower has a preference in retaining his or her

home. [9] Borrowers who submit complete Non-Retention Applications are entitled

---

[8] 12 C.F.R. § 1024.41(f)(2)(i)-(iii) & (g)(i)-(iii).
[9] Regulation X defines Loss-Mitigation Application as "an oral or written request for a loss mitigation option that is accompanied by any information required by a servicer for evaluation for a loss mitigation option." 12 C.F.R. § 1024.31. A Loss-Mitigation Option is defined as "an alternative to foreclosure offered by the owner or assignee of a mortgage loan that is made available through the servicer to the borrower." 12 C.F.R. § 1024.31. The Official Commentary related to the definition of Loss-Mitigation Option states, "Loss mitigation options include temporary and long-term relief, including options that allow borrowers who are behind on their mortgage payments to remain in their homes or to leave their homes without a foreclosure, such as, without limitation, refinancing, trial or permanent modifications, . . . short-sale, deed-in-lieu of foreclosure. . . .."). Official Commentary, § 1024.31-1. The definition of Loss-Mitigation Application includes requests for alternatives to foreclosure that allow borrowers to remain in their home or to leave their homes without a foreclosure. Protections afforded to Loss-

to the same protections as borrowers who submit complete Retention
Applications.

26.  For a borrower who submitted a complete Non-Retention Application,
Respondent's policies left foreclosure protections to the discretion of its
personnel and its Foreclosure Review Committee.

27.  Respondent's Foreclosure Review Committee typically reviewed loans seven days
before a scheduled foreclosure sale to determine whether the sale should be
conducted or postponed. Thus, even if Respondent's Foreclosure Review
Committee determined that a foreclosure sale should be postponed, that
determination would generally be made seven days or less before a foreclosure
sale, and would not address foreclosure protections a borrower was entitled to
earlier in the process, such as protections from First Filings and motions for
foreclosure judgment or an order of sale.

28.  Respondent's policies and procedures failed to instruct or incorrectly instructed
personnel about foreclosure protections under the Mortgage Servicing Rules, and
as a result, permitted foreclosure actions prohibited by law. Respondent's policies
and procedures therefore were not reasonably designed to ensure that foreclosure
documents and filings complied with applicable law.

29.  Respondent therefore violated Regulation X by taking prohibited foreclosure
actions against borrowers,[10] and by failing to have reasonably designed policies

---

Mitigation Applications under Regulation X, therefore, apply to all Loss-Mitigation
Applications regardless if the borrower has a preference in retaining his or her home.
[10] 12 C.F.R. § 1024.41(f)(2), (g).

14

and procedures to achieve the objectives set forth in the Mortgage Servicing

Rules.[11]

### Findings and Conclusions as to Respondent's Failures to Send or Timely Send Acknowledgment Notices

30.     Since January 10, 2014, Respondent, in numerous instances, failed to send or

timely send borrowers Acknowledgment Notices within five business days

(excluding legal public holidays) notifying borrowers in writing, among other

things, that Respondent had received their Loss-Mitigation Applications and had

determined that the Loss-Mitigation Applications were either complete or

incomplete.[12]

31.     Respondent failed to send or timely send borrowers Acknowledgment Notices in

part because its policies and procedures did not properly instruct its personnel

about how to handle Loss-Mitigation Applications.

32.     Regulation X requires servicers to maintain policies and procedures reasonably

designed to achieve certain objectives enumerated in 12 C.F.R. § 1024.38(b).[13]

Among other things, a servicer's policies and procedures must be reasonably

designed to ensure that the servicer can identify the documents and information

required from a borrower to complete an application and comply with the

Acknowledgment Notice requirement under 12 C.F.R. § 1024.41(b)(2)(i)(B).[14]

33.     On and after January 10, 2014, Respondent had no policies or procedures for

sending Acknowledgment Notices to borrowers. It was not until March 10, 2014,

that Respondent started to send Acknowledgment Notices in response to

---

[11] 12 C.F.R. § 1024.38(b)(1)(v).
[12] 12 C.F.R. § 1024.41(b)(2)(i).
[13] 12 C.F.R. § 1024.38(a).
[14] 12 C.F.R. § 1024.38(b)(2)(iv).

Retention Applications. During the time between January 10, 2014 and March 10, 2014, Respondent used the Home Affordable Modification Program's Notice of Incompleteness to notify borrowers of missing documents, but only in response to Retention Applications.

34. Even after Respondent implemented policies related to Acknowledgment Notices and commenced sending notices, Respondent still routinely failed to send or timely send Acknowledgment Notices in response to Retention Applications.

35. Further, Respondent's policy called for Acknowledgment Notices only in response to Retention Applications. Respondent's policies did not require personnel to send Acknowledgment Notices to borrowers who submitted Non-Retention Applications, and Respondent routinely failed to send Acknowledgment Notices to borrowers who submitted such applications.

36. Since January 10, 2014, Respondent failed to send or timely send Acknowledgment Notices to numerous borrowers who were entitled to Acknowledgment Notices under Regulation X.[15]

37. Respondent therefore violated Regulation X by failing to send or timely send Acknowledgment Notices to borrowers entitled to receive them,[16] and by failing to have reasonably designed policies and procedures related to Acknowledgment Notices.[17]

---

[15] 12 C.F.R. § 1024.41(b)(2)(i)(B).
[16] 12 C.F.R. § 1024.41(b)(2)(i)(B).
[17] 12 C.F.R. § 1024.38(b)(2)(iv).

16

### Findings and Conclusions as to Respondent's Failures to Send or Timely Send Evaluation Notices

38. Since January 10, 2014, Respondent in numerous instances failed to send or timely send borrowers Evaluation Notices within 30 days of receiving their complete Loss-Mitigation Applications.[18]

39. Respondent failed to send or timely send borrowers Evaluation Notices in part because its policies and procedures did not properly instruct its personnel about how to handle complete Loss-Mitigation Applications.

40. Regulation X requires servicers to maintain policies and procedures reasonably designed to achieve certain objectives that are enumerated in 12 C.F.R. § 1024.38(b). Among other things, a servicer's policies and procedures must be reasonably designed to ensure that the servicer can properly evaluate a borrower who submits an application for all Loss-Mitigation Options for which the borrower may be eligible in accordance with the requirements of 12 C.F.R. § 1024.41. Properly evaluating a borrower in accordance with 12 C.F.R. § 1024.41 includes sending a borrower an Evaluation Notice within 30 days of receiving a complete Loss-Mitigation Application.[19] These protections apply to all complete Loss-Mitigation Applications, regardless of whether the borrower indicated a preference for a Loss-Mitigation Option that allows him or her to retain the home.

41. On and after January 10, 2014, Respondent had no policies for sending Evaluation Notices to borrowers. It was not until April 29, 2014, that Respondent

---

[18] 12 C.F.R. § 1024.41(c)(1).
[19] 12 C.F.R. § 1024.38(a) & (b)(2)(v).

implemented policies related to Evaluation Notices and started to send Evaluation Notices in response to complete Retention Applications.

42.  Even after Respondent implemented policies related to Evaluation Notices and commenced sending such notices, it still routinely failed to send or timely send Evaluation Notices in response to complete Retention Applications.

43.  Further, Respondent's policy called for Evaluation Notices only in response to the receipt of complete Retention Applications. Respondent's policies never required personnel to send Evaluation Notices to borrowers who submitted complete Non-Retention Applications, and Respondent routinely failed to send Evaluation Notices to borrowers who submitted such complete Loss-Mitigation Applications.

44.  Since January 10, 2014, Respondent failed to send or timely send Evaluation Notices to numerous borrowers who were entitled to Evaluation Notices under Regulation X.[20]

45.  Respondent therefore violated Regulation X by failing to send or timely send Evaluation Notices to borrowers entitled to receive them,[21] and by failing to have reasonably designed policies and procedures related to Evaluation Notices.[22]

### Findings and Conclusions as to Respondent's Insufficient Acknowledgment Notices

46.  Respondent commenced sending Acknowledgment Notices to borrowers on March 10, 2014, using an Acknowledgment Notice template setting forth eight categories of documents or information those borrowers could be required to submit to complete their Loss-Mitigation Applications. Respondent marked a

---

[20] 12 C.F.R. § 1024.41(c)(1).
[21] 12 C.F.R. § 1024.41(c)(1).
[22] 12 C.F.R. § 1024.38(a) & (b)(2)(v).

category with an "X" if it needed the borrower to submit documents or information in that category to complete his or her application.

47.   One of the categories in Respondent's Acknowledgment Notice— "Income Documentation (e.g., two most recent pay stubs)"—is merely a broad description that may refer to several different types of documents. This category description does not identify the actual additional documents or information the borrowers must submit to make the Loss-Mitigation Application complete.

48.   Respondent needed borrowers to submit documents establishing certain types of income as part of their Loss-Mitigation Applications in order to evaluate their Loss-Mitigation Applications. The documents necessary vary depending on the source of the borrower's income. For borrowers with self-employment income, Respondent needed borrowers to submit, among other things, profit and loss statements for the period from the last filed tax return to the present month. For borrowers receiving benefit income, Respondent needed borrowers to submit, among other things, documentation showing the amount and frequency of the benefit income, such as award or benefit letters.

49.   Respondent's Acknowledgment Notice does not, however, identify required income documents by name. Instead, where Respondent had determined that borrowers needed to submit, for example, profit and loss statements as proof of self-employment income, or award or benefit letters as proof of benefit income, Respondent's Acknowledgment Notices simply contain an "X" next to the general category "Income Documentation (e.g., two most recent pay stubs)." Therefore, Respondent failed to state the actual documents needed from the borrower to complete his or her Loss-Mitigation Application.

19

50. In the instances where borrowers received Respondent's deficient Acknowledgment Notices, Respondent therefore failed to state the additional documents and information borrowers needed to submit to complete their Loss-Mitigation Applications, in violation of 12 C.F.R. § 1024.41(b)(2)(i)(B).

51. Regulation X, specifically 12 C.F.R § 1024.38(a), requires servicers to maintain policies and procedures that are reasonably designed to achieve objectives enumerated in 12 C.F.R. § 1024.38(b). Among other things, a servicer's policies and procedures must be reasonably designed to ensure that it can identify the documents and information borrowers must submit to complete their Loss-Mitigation Applications, and to facilitate compliance with the notice requirements under 12 C.F.R. § 1024.41(b)(2)(i)(B).

52. Respondent's policies and procedures were not reasonably designed to facilitate compliance with the notice requirements under 12 C.F.R. § 1024.41(b)(2)(i)(B). In particular, Respondent's policies and procedures involved use of an Acknowledgment Notice template that in some instances did not state the additional documents and information borrowers were required to submit to complete Loss-Mitigation Applications.

53. Respondent therefore violated Regulation X by failing to send to certain borrowers Acknowledgment Notices that stated the additional documents and information necessary to complete their Loss-Mitigation Applications,[23] and by

---

[23] 12 C.F.R. § 1024.41(b)(2)(i)(B).

failing to have reasonably designed policies and procedures related to Acknowledgment Notices.[24]

### Findings and Conclusions as to Respondent's Inaccurate Evaluation Notices

54. The Mortgage Servicing Rules require servicers to allow a borrower to appeal the denial of any loan-modification option if a complete Loss-Mitigation Application was received before the First Filing was made or 90 days or more before a foreclosure sale, if certain conditions apply.[25] If a borrower has the right to appeal, the servicer must notify the borrower of this right in the Evaluation Notice.[26]

55. Respondent's Evaluation Notice advised borrowers that they were entitled to an appeal if a foreclosure sale was 90 days or more from the date on the Evaluation Notice.

56. Respondent's Evaluation Notices inaccurately stated the borrower's right to appeal the denial of any loan modification option and the requirements for making an appeal, in violation of 12 C.F.R. § 1024.41(c)(1)(ii) & (h).

## ORDER
## VI
## Conduct Provisions

**IT IS ORDERED**, under sections 1053 and 1055 of the CFPA, that:

57. Respondent and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not

---

[24] 12 C.F.R. § 1024.38(a) & (b)(2)(v).
[25] 12 C.F.R. § 1024.41(h)(1).
[26] 12 C.F.R. § 1024.41(c)(1)(ii).

violate RESPA, 12 U.S.C. 2601, *et seq.*, its implementing regulation, Regulation X, 12 C.F.R. part 1024, and the CFPA and must take the following affirmative actions:

a.   For Affected Consumers who were subject to Foreclosure Violations, where a foreclosure sale has not been completed, the borrower has not been evaluated for all available Loss-Mitigation Options, and Respondent is still servicing the loan, Respondent must:

   i.   If the Foreclosure Violation was Respondent's making a First Filing in a non-judicial foreclosure process, Respondent must stop the foreclosure proceeding; and update and correct any information related to the foreclosure proceeding the Respondent furnishes to any consumer reporting agency, including requesting that any information that indicates the First Filing in the foreclosure proceeding be removed;

   ii.   If the Foreclosure Violation was Respondent's making a First Filing in a judicial foreclosure process, Respondent must stop the foreclosure proceeding, dismiss the complaint; and update and correct any information related to the foreclosure proceeding furnished by the Respondent to any consumer reporting agency, including requesting that any information that indicates the First Filing in the foreclosure proceeding be removed, such as the BO code;

   iii.   If the Foreclosure Violation was Respondent's Moving for Judgment, Respondent must stop the foreclosure process, must move to vacate the judgment, if applicable; and update and correct any information related to the foreclosure proceeding furnished by the Respondent to any

22

consumer reporting agency, including requesting that any information that indicates Respondent Moved for Judgment in the foreclosure proceeding be removed;

iv.   If the Foreclosure Violation was Respondent's conducting a foreclosure sale that was later rescinded, Respondent must stop the foreclosure process; and update and correct any information related to the foreclosure proceeding furnished by the Respondent to any consumer reporting agency, including requesting that any information that indicates Respondent conducted a foreclosure sale be removed; and

v.    Solicit the Affected Consumer for available Loss-Mitigation Options. Respondent must not take foreclosure actions against the Affected Consumer during the outreach and solicitation process. If the Affected Consumer submits a Loss-Mitigation Application in response to Respondent's solicitation within 60 days, Respondent must not take any foreclosure actions against the Affected Consumer during the loss-mitigation process. If the Affected Consumer submits a complete Loss-Mitigation Application, it must be evaluated for Loss-Mitigation Options on an expedited basis, and the foreclosure protections must remain in place until the later of the dates set forth in 12 C.F.R. § 1024.41(f)(2)(i)-(iii) or (g)(1)-(3), as applicable. Any Loss-Mitigation Application submitted in response to Respondent's solicitation must adhere to the requirements of 12 C.F.R. § 1024.41 unless otherwise specified in this paragraph.

b.  For Affected Consumers who received No Evaluation Notice, No Acknowledgment Notice, or Untimely Acknowledgment Notice, where a foreclosure sale has not been completed, the Affected Consumer has not been evaluated for all available Loss-Mitigation Options, and Respondent is still servicing the loan:

    i.  Respondent must solicit the borrower for all Loss-Mitigation Options available to the Affected Consumer;

    ii.  Respondent must not take foreclosure actions against the Affected Consumer during the outreach and solicitation process; and

    iii.  if the Affected Consumer submits a Loss-Mitigation Application in response to Respondent's solicitation within 60 days, Respondent must not take any foreclosure actions against the Affected Consumer during the loss-mitigation process. If the Affected Consumer submits a complete Loss-Mitigation Application it must be evaluated for Loss-Mitigation Options on an expedited basis, and the foreclosure protections must remain in place until the later of the dates set forth in 12 C.F.R. § 1024.41(f)(2)(1)-(iii) or (g)(1)-(3), as applicable. Any Loss-Mitigation Application submitted in response to Respondent's solicitation must adhere to the requirements of 12 C.F.R. § 1024.41 unless otherwise specified in this paragraph.

c.  Develop and implement policies and procedures that ensure borrowers are appropriately protected from prohibited foreclosure events in accordance with 12 C.F.R. § 1024.41(f)(2) & (g), including:

i.    Ensuring Respondent does not make First Filings against borrowers who submit facially complete or complete Loss-Mitigation Applications during the pre-foreclosure review period set forth in 12 C.F.R. § 1024.41(f)(1) or before Respondent makes the First Filing, if the Loss-Mitigation Applications meet all other requirements for foreclosure protections under 12 C.F.R. § 1024.41;

ii.   Ensuring Respondent does not move for foreclosure judgments or orders of sale, or conduct foreclosure sales against borrowers who submit facially compete or complete Loss-Mitigation Applications more than 37 days before the foreclosure sales, if the Loss-Mitigation Applications meet all other requirements for foreclosure protections under 12 C.F.R. § 1024.41;

iii.  Ensuring Respondent continues the foreclosure protections described in paragraphs (b)(i) and (ii) above until borrowers meet one of the conditions listed under 12 C.F.R. § 1024.41(f)(2)(i)-(iii) & (g)(1)-(3), as applicable; and

iv.   Reviewing the foreclosure actions Respondent takes in a timely manner to ensure borrowers receive the required foreclosure protections, personnel adhere to Respondent's policies and procedures, and implements controls to ensure effective compliance with policies and procedures.

d.  Record, maintain, and track activities and events that evidence compliance with 12 C.F.R. §§ 1024.41(b)(2), (c)(1), (f)(2), and (g) as information in data fields or information that can be derived from data fields in Respondent's

information system, and maintain a historical record of all information entered into those data fields, including:

i.     The date a Loss-Mitigation Application becomes facially complete;

ii.    The date a Loss-Mitigation Application becomes complete;

iii.   The date an Acknowledgment Notice is sent to a borrower;

iv.    The date stated in the Acknowledgment Notice by which a borrower must return the required documents;

v.     The document(s) or information Respondent requests in the Acknowledgment Notice from each borrower, co-borrower, or other party;

vi.    For each document received, the date the document is received, the type of document received (using the same categories to identify the type of documents requested as are used in the Acknowledgment Notice), and the person associated with the document (*e.g.*, borrower, co-borrower, third party);

vii.   The date on which the last document or information Respondent requests in the Acknowledgment Notice is received that makes the Loss-Mitigation Application facially complete;

viii.  The date on which the last document is received that makes the Loss-Mitigation Application complete (the Complete Date);

ix.    The scheduled foreclosure sale date as of the Complete Date;

x.     The date on which Respondent requests any additional documents or information from the borrower after the Complete Date;

26

xi.    The date by which a borrower is required to provide any additional documents or information after the Complete Date;

xii.    The date on which the borrower provides all of the additional documents or information Respondent requests after the Complete Date;

xiii.    Whether the Loss-Mitigation Application is evaluated as a complete Loss-Mitigation Application or as an incomplete Loss-Mitigation Application;

xiv.    The date on which the evaluation of the Loss-Mitigation Application for Loss-Mitigation Options is complete;

xv.    The date on which the Evaluation Notice is sent to the borrower;

xvi.    The Loss-Mitigation Option(s) Respondent offers to the borrower;

xvii.    Whether the borrower is denied any loan-modification option(s);

xviii.    The date by which the borrower must reject or accept the offered Loss-Mitigation Option(s);

xix.    The date on which the borrower rejects, or is deemed to have rejected, the offered Loss-Mitigation Option(s);

xx.    The reason the borrower rejects, or is deemed to have rejected, the offered Loss-Mitigation Option(s);

xxi.    If Respondent offers a loan modification, the amount of each payment required during the trial period, the length of the trial period, and the due dates for each payment;

xxii.    The amount of each payment made after the date of the Evaluation Notice;

xxiii.    The date of each payment;

xxiv.     The date by which a borrower must appeal a denial;

xxv.      The date Respondent receives the borrower's appeal;

xxvi.     The result of any appeal;

xxvii.    The date on which Respondent sends the notice of the appeal
          determination;

xxviii.   The date on which the trial loan modification is converted to a
          permanent loan modification;

xxix.     The date of the First Filing;

xxx.      The date of delinquency or days past due on the date of the First Filing;

xxxi.     The date(s) on which the property is scheduled to be sold in a foreclosure
          sale (the "Sale Date");

xxxii.    The date(s) on which the Sale Date is set;

xxxiii.   The date(s) Respondent moves for foreclosure judgment or an order of
          sale, including dispositive motions such as motions for default judgment,
          judgment on the pleadings, or summary judgment;

xxxiv.    The date(s) Respondent moves or files motions to set a Sale Date;

xxxv.     The date(s) Respondent issues, sends, posts, records, or publishes a
          notice of sale;

xxxvi.    The date(s) Respondent takes the last action in the foreclosure
          proceeding that will cause or directly result in the issuance of a
          foreclosure judgment, order of sale, or conduct of the sale, and a
          description of the action taken;

xxxvii.   The date(s) foreclosure counsel takes action in response to the placement
          of a hold, including motions to postpone or hold in abeyance the entry of

judgment or order of sale, motions to withdraw the pending dispositive motion, and a description of the action taken;

xxxviii. The date(s) foreclosure sales are rescheduled, postponed, or cancelled;

xxxix. The date(s) Respondent takes action to reschedule, postpone, or cancel a foreclosure sale;

xl. The start date of any foreclosure hold;

xli. The end date of any foreclosure hold;

xlii. The date on which Respondent informs foreclosure counsel of any hold;

xliii. The date on which foreclosure counsel confirms any hold;

xliv. Whether foreclosure counsel seeks to postpone a pending sale;

xlv. The date on which foreclosure counsel seeks to postpone a pending sale;

xlvi. If foreclosure counsel seeks a postponement, the identity of the judge;

xlvii. If foreclosure counsel seeks a postponement, whether the court allows the postponement;

xlviii. If the court allows the postponement, the date a court allows the postponement;

xlix. If the court disallows the postponement, whether the court requests the evaluation status of the Loss-Mitigation Application;

l. If the court disallows the postponement and requests the evaluation status of a borrower's Loss-Mitigation Application, whether foreclosure counsel informs the court of whether the borrower qualified or not for Loss-Mitigation Options;

li. If the court disallows the postponement, why the court rejects the postponement request;

29

lii.    If the court disallows the postponement, whether foreclosure counsel seeks to dismiss the action;

liii.   If the court disallows the postponement, whether foreclosure counsel seeks to delay the sale with the sheriff;

liv.    The date on which Respondent rescinds the foreclosure sale; and

lv.     When Respondent seeks court approval, if relevant, to rescind a foreclosure sale.

e.   Record and maintain the data required by Paragraph 57(d) in a manner that allows Respondent to produce it on a real-time or near-real-time basis.

f.   Create a written record that documents how Respondent records, maintains, and tracks the activities and events that evidence compliance with 12 C.F.R. §§ 1024.41(b)(2), (c)(1), (f)(2), and (g) as information in data fields or information that can be derived from data fields in Respondent's information system. The document must identify the data fields in Respondent's information system to the information required by Paragraph 57(d), and explain how the information from Paragraph 57(d) is derived from the identified data fields. The document also must describe how Respondent maintains a historical record of all the information entered into the data fields used to derive the information required by Paragraph 57(d), identify the data fields Respondent uses to maintain the historical information required by Paragraph 57(d), and explain how the historical information from Paragraph 57(d) is derived from the identified data fields.

g.  Implement controls to ensure Respondent's personnel are correctly entering data into Respondent's information system, including the information required by Paragraph 57(d).

h.  Monitor foreclosure activity to ensure that before an action is taken, it is not prohibited by 12 C.F.R. § 1024.41(f)(2) or (g), including checking a Loss-Mitigation Application's status and whether a document has been submitted that could make the application facially complete or complete.

i.  Monitor and test foreclosure holds to ensure they are timely placed and are effective from the date Respondent received the document making an application facially complete or complete, and ensure that no Foreclosure Violation occurs between the date Respondent received the facially complete or complete application and the date foreclosure counsel put the foreclosure proceeding on hold.

j.  Monitor and test to ensure that foreclosure counsel takes reasonable steps in response to the placement of a hold, including taking reasonable steps to avoid a ruling on motions that may directly result in a judgment of foreclosure or order of sale.

k.  Promptly instruct or provide guidance to foreclosure counsel to stop certain foreclosure activity, or to take reasonable steps to avoid a ruling on any pending motions for judgment or orders of sale when a Loss Mitigation Application is complete or facially complete.

l.  Provide Acknowledgment Notices to borrowers who submit incomplete Loss-Mitigation Applications that state in a concise and accurate manner the specific additional documents and information needed to complete the Loss-

Mitigation Applications where Respondent possesses, at the time borrowers submit their Loss-Mitigation Applications, information or documentation sufficient to inform the borrower of the specific information and documents needed. Where Respondent does not possess, at the time the borrowers submit their Loss-Mitigation Applications, information or documentation to know what specific information or documentation is needed, it must provide Acknowledgment Notices to borrowers that state in a concise and accurate manner (1) the types of additional specific income documents the borrower may need to submit depending on the borrowers' specific circumstances and (2) what additional specific income document would be required for each of those circumstances. The Acknowledgment Notice must not include requests that are merely broad categories of several types of documents, such as "income documentation," and must not use e.g., etcetera, or otherwise merely give examples of documents when describing the documents and information that must be submitted. Further, the Acknowledgment Notice also must not request documents and information when Respondent possesses, at the time a borrower submits a Loss-Mitigation Application, information or documentation sufficient to know they are not required from the borrower.

m. Provide Evaluation Notices to borrowers that correctly state their eligibility for an appeal.

n. Review the other communications Respondent sends to borrowers engaged in the loss-mitigation process to ensure compliance with the Mortgage Servicing Rules, and revise all communications that are not in compliance.

o. Develop written policies and procedures that ensure compliance with 12 C.F.R. § 1024.41, train and re-train all personnel and service providers on the written policies and procedures developed with appropriate frequency and when they change, and implement controls to test Respondent's personnel's compliance with its policies and procedures with appropriate frequency.

p. Report the results of compliance testing to the Compliance Committee responsible to ensure Respondent meets its obligations under this Consent Order.

q. Perform testing and quarterly reporting on the measures implemented as part of the Compliance Plan.

r. Perform testing to ensure that it is meeting its obligations under the consent order, including testing the automated or technological components of its processes (e.g., holds) and its data integrity.

s. Provide monthly status reports to the Regional Director detailing the development and implementation of the measures set forth in this Consent Order until such time as Respondent submits for non-objection to the Regional Director the request to no longer provide the status reports, which will in no instance be before the implementation and initial testing of implemented measures.

t. Perform tests and provide reports related to this Consent Order that the Bureau, in its sole discretion, may direct Respondent to perform.

58. Respondent, and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, must not commence foreclosure proceedings and must stop taking actions in

foreclosure proceedings against borrowers who: (1) submit or have pending Non-Retention Applications; (2) are only being evaluated for Loss-Mitigation Options that do not allow the borrower to retain the home; and (3) qualify for protections under 12 C.F.R. § 1024.41. Further, Respondent must not commence or take actions in foreclosure proceedings against these borrowers without first securing a determination of non-objection from the Regional Director, as follows:

a.  Respondent must submit to the Regional Director a comprehensive compliance plan designed to ensure that Respondent's foreclosure policies and procedures comply with 12 C.F.R. § 1024.41(f)(2) & (g) for borrowers who submit Non-Retention Applications and are only being evaluated for Loss-Mitigations that do not allow the borrower to retain the home (Foreclosure Compliance Plan).

b.  The Regional Director will have the discretion to make a determination of non-objection to the Foreclosure Compliance Plan or direct Respondent to revise it. If the Regional Director directs Respondent to revise the Foreclosure Compliance Plan, Respondent must make the revisions and resubmit the Foreclosure Compliance Plan to the Regional Director in 30 days.

## VII
## Compliance Committee and Compliance Plan

**IT IS FURTHER ORDERED** that:

59.  The Board must establish a Compliance Committee of at least three directors, of which at least two may not be officers or employees of Respondent or any of its affiliates. Within 15 business days of the Effective Date, the Board must provide in writing to the Regional Director the name of each member of the Compliance

Committee. If there is a change of membership of the Compliance Committee, the Board must submit the name of any new member in writing to the Regional Director within 10 days.

60. For 5 years from the Effective Date, the Compliance Committee will be responsible for monitoring and coordinating Respondent's adherence to the provisions of this Consent Order. The Compliance Committee must meet at least bi-monthly, and must maintain minutes of its meetings.

61. Within 60 days of the Effective Date, the Compliance Committee must submit a Compliance Plan to the Regional Director for review and determination of non-objection, which details the actions taken to comply with this Consent Order, and the results and status of those actions. The Compliance Plan must also, at a minimum, address:

   a. Detailed steps for addressing each action required by this Consent Order, including all of the actions required by Paragraph 57;

   b. The implementation deadlines for all steps outlined in the Compliance Plan, including all of the actions required by Paragraph 57;

   c. Quarterly reporting to the Board about the status of each step in the Compliance Plan; and

   d. Specific timeframes and deadlines for implementation of the steps described above.

62. The Regional Director will have the discretion to make a determination of non-objection to the Compliance Plan or direct Respondent to revise it. If the Regional Director directs Respondent to revise the Compliance Plan, Respondent

must make the revisions and resubmit the Compliance Plan to the Regional Director within 30 days.

63.   After receiving notification that the Regional Director has made a determination of non-objection to the Compliance Plan or the Foreclosure Compliance Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan or the Foreclosure Compliance Plan, as applicable.

# VIII
## Role of the Board

**IT IS FURTHER ORDERED** that:

64.   The Board or a committee thereof must review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order prior to submission to the Bureau.

65.   Although this Consent Order requires Respondent to submit certain documents for review or non-objection by the Regional Director, the Board will have the ultimate responsibility for proper and sound management of Respondent and for ensuring that Respondent complies with Federal consumer financial law and this Consent Order.

66.   In each instance that this Consent Order requires the Board to ensure adherence to, or perform certain obligations of Respondent, the Board must:

   a.   Authorize whatever actions are necessary for Respondent to fully comply with the Consent Order;

   b.   Require timely reporting by management to the Board on the status of compliance obligations; and

c.  Require timely and appropriate corrective action to remedy any material non-compliance with any failures to comply with Board directives related to this Section.

## IX
## Order to Pay Redress

**IT IS FURTHER ORDERED** that:

67.  Respondent will pay redress to consumers as set forth herein.

68.  Within 10 business days of the Effective Date, Respondent must reserve or deposit into a segregated deposit account $1,150,000, for the purpose of providing redress to Affected Consumers as required by this Section. Respondent's obligation to pay redress of $1,150,000 takes into account its demonstrated inability to pay redress in a greater amount.

69.  Within 45 days of the Effective Date, Respondent must submit to the Regional Director for review and non-objection a comprehensive written plan for providing redress consistent with this Consent Order (Redress Plan). The Regional Director will have the discretion to make a determination of non-objection to the Redress Plan or direct Respondent to revise it. If the Regional Director directs Respondent to revise the Redress Plan, Respondent must make the revisions and resubmit the Redress Plan to the Regional Director within 15 days. After receiving notification that the Regional Director has made a determination of non-objection to the Redress Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Redress Plan.

70.  The Redress Plan, at a minimum, must:

37

a. Specify how Respondent will identify all Affected Consumers, including its methodology for identifying each Foreclosure Violation that occurred for each Affected Consumer, and specify the amount of redress to be paid to each Affected Consumer. The Bureau will have sole discretion to make a final determination of the amounts of the payments to be made to Affected Consumers under the Redress Plan.

b. Include a deadline by which the initial redress payments will be made to Affected Consumers, which may not be later than 30 days from the Regional Director's determination of non-objection to the Redress Plan. For any Affected Consumer whose redress payment is returned, Respondent must take the steps required by this Consent Order to find a current address for the Affected Consumer, and issue a second redress payment no later than 30 days from the date on which the redress payment is returned.

c. Include the form of the letter(s) or other communication(s) (Redress Notification Letter) to be sent to Affected Consumers who are receiving redress from the Respondent and the form of the envelope(s) that will contain the Redress Notification Letter(s). The Redress Notification Letter(s) and form envelope(s) must be approved by the Regional Director. Any changes made to the Redress Notification Letter(s) or form envelope(s) by the Regional Director must be included. The Redress Notification Letter(s) must explain why the Affected Consumer is receiving redress, state that Respondent is providing redress because of this Consent Order, and direct the Affected Consumer to the Bureau's website address that contains the Consent Order. Respondent may not include in any envelope containing a Redress

38

Notification Letter any materials other than the approved letter and redress

check, unless Respondent obtains written confirmation from the Regional

Director that the Bureau does not object to the inclusion of the additional

materials;

d.  When Respondent makes redress payments to Affected Consumers, require

the checks be sent by United States Postal Service first-class mail, address

correction service requested, to the Affected Consumer's most recent address

as maintained in Respondent's records;

e.  For any Affected Consumer whose redress payment is returned, require

Respondent to make reasonable attempts to obtain a current address using

standard address search methodologies, including a standard address search

using the National Change of Address system and to promptly re-mail all

returned redress checks to current addresses, if any; and

f.  If the check for any eligible consumer is returned to Respondent after a

second mailing, and if a current mailing address cannot be identified using

standard address search methodologies, or if the check goes uncashed for 90

days after the last issued redress payment, require Respondent to retain the

Redress Amount for that Affected Consumer for a period of three-hundred

sixty (360) days from the date the redress check was originally mailed, or a

shorter period of time if required by law, during which period such amount

may be claimed by such Affected Consumer upon appropriate proof of

identity and, after such time, dispose of these monies in accordance with this

Section.

71.  Within 45 days of completion of the Redress Plan, Respondent's internal audit department must review and assess Respondent's compliance with the terms of the Redress Plan (Redress Review).

72.  The Redress Review must include an assessment of the Redress Plan and the methodology used to identify Affected Consumers and the applicable violations for Affected Consumers that qualify them to receive redress under this Consent Order, the Redress Amount for each Affected Consumer, the procedures used to issue and track payments of the Redress Amounts to Affected Consumers, and whether the Redress Plan has been properly executed. The Redress Review must also include an audit of the Redress Amount to provide reasonable assurance that Affected Consumers received the correct Redress Amount.

73.  The Redress Review will be summarized in a written report (Redress Review Report), which must be submitted to the Regional Director and to the Board within 60 days of completion of the Redress Review.

74.  The Redress Plan must provide for payments to Affected Consumers in order to compensate Affected Consumers for, among other things, their costs, including the borrowers' transportation costs, communication costs, time off work, opportunity costs, attorney's fees, filing and court fees, relocation costs, and emotional distress suffered as a result of Respondent's misconduct.

75.  After completing the Redress Plan, if the amount of redress provided to Affected Consumers is less than $1,150,000, within 30 days of the completion of the Redress Plan, Respondent must pay to the Bureau, by wire transfer to the Bureau or to the Bureau's agent, and according to the Bureau's wiring instructions, the

difference between the amount of redress provided to Affected Consumers and $1,150,000.

76. To the extent these redress payments are not claimed within the 360 days Respondent is required to hold the funds under Paragraph 70 (Unclaimed Redress Payments), Respondent must pay to the Bureau, by wire transfer to the Bureau or to the Bureau's agent, and according to the Bureau's wiring instructions, the Unclaimed Redress Payments. The Bureau may use these remaining funds to pay additional redress to Affected Consumers. If the Bureau determines, in its sole discretion, that additional redress is wholly or partially impracticable or otherwise inappropriate, or if funds remain after the additional redress is completed, the Bureau will deposit any remaining funds in the U.S. Treasury as disgorgement. Respondent will have no right to challenge any actions that the Bureau or its representatives may take under this Section.

77. Respondent may not condition the payment of any redress to any Affected Consumer under this Consent Order on that Affected Consumer waiving any right.

78. Any funds received by the Bureau in satisfaction of this judgment will be deposited into a fund or funds administered by the Bureau or to the Bureau's agent according to applicable statutes and regulations to be used for redress for injured consumers, including, but not limited to, refund of moneys, restitution, damages or other monetary relief, and for any attendant expenses for the administration of any such redress.

# X
## Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

79.  In the event of any default on Respondent's obligations to make payment under this Consent Order, interest, computed under 28 U.S.C. § 1961, as amended, will accrue on any outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

80.  Respondent must relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law and no part of the funds may be returned to Respondent.

81.  Under 31 U.S.C. § 7701, Respondent, unless it already has done so, must furnish to the Bureau its taxpayer identifying numbers, which may be used for purposes of collecting and reporting on any delinquent amount arising out of this Consent Order.

82.  Within 30 days of the entry of a final judgment, consent order, or settlement in a Related Consumer Action, Respondent must notify the Regional Director of the final judgment, consent order, or settlement in writing. That notification must indicate the amount of redress, if any, that Respondent paid or is required to pay to consumers and describe the consumers or classes of consumers to whom that redress has been or will be paid.

# XI
## Reporting Requirements

**IT IS FURTHER ORDERED** that:

83. Respondent must notify the Bureau of any development that may affect compliance obligations arising under this Consent Order, including but not limited to, a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Consent Order; the filing of any bankruptcy or insolvency proceeding by or against Respondent; or a change in Respondent's name or address. Respondent must provide this notice, if practicable, at least 30 days before the development, but in any case no later than 14 days after the development.

84. Within 7 business days of the Effective Date, Respondent must:

    a. Designate at least one telephone number and email, physical, and postal address as points of contact, which the Bureau may use to communicate with Respondent;

    b. Identify all businesses for which Respondent is the majority owner, or that Respondent directly or indirectly controls, by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;

    c. Describe the activities of each such business, including the products and services offered, and the means of advertising, marketing, and sales.

85. Respondent must report any change in the information required to be submitted under Paragraph 84 at least 30 days before the change or as soon as practicable after learning about the change, whichever is sooner.

43

86. Within 90 days of the Effective Date, and again one year after the Effective Date, Respondent must submit to the Regional Director an accurate written compliance progress report (Compliance Report) that has been approved by the Board, which, at a minimum:

   a. Describes in detail the manner and form in which Respondent has complied with this Consent Order; and

   b. Attaches a copy of each Order Acknowledgment obtained under Section XII, unless previously submitted to the Bureau.

## XII
## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that:

87. Within 7 business days of the Effective Date, Respondent must submit to the Regional Director an acknowledgment of receipt of this Consent Order, sworn under penalty of perjury.

88. Within 30 days of the Effective Date, Respondent must deliver a copy of this Consent Order to each of its board members and executive officers, as well as to any managers, employees, Service Providers, or other agents and representatives who have responsibilities related to the subject matter of the Consent Order.

89. For 5 years from the Effective Date, Respondent must deliver a copy of this Consent Order to any business entity resulting from any change in structure referred to in Section XI, any future board members and executive officers, as well as to any managers, employees, Service Providers, or other agents and representatives who will have responsibilities related to the subject matter of the Consent Order before they assume their responsibilities.

44

90.   Respondent must secure a signed and dated statement acknowledging receipt of a copy of this Consent Order, ensuring that any electronic signatures comply with the requirements of the E-Sign Act, 15 U.S.C. § 7001 *et seq.*, within 30 days of delivery, from all persons receiving a copy of this Consent Order under this Section.

## XIII
## Recordkeeping

**IT IS FURTHER ORDERED** that:

91.   Respondent must create and retain, or if already created must retain, the following business records for at least 5 years from the Effective Date:

a.   All documents and records necessary to demonstrate full compliance with each provision of this Consent Order, including all submissions to the Bureau.

b.   All documents and records pertaining to the Redress Plan, described in Section IX above.

c.   Copies of all template communications with borrowers engaged in the loss-mitigation process, all policies and procedures related to loss-mitigation and foreclosure, all training materials related to the loss-mitigation process and foreclosure; and all data related to the servicing of loans, including the data elements required by Section VI.

d.   For each individual Affected Consumer: the consumer's name, last known address, last known phone number, and last known email address (if available); amount paid, date on which Respondent began servicing the Affected Consumer's loan, date on which Respondent stopped servicing the

Affected Consumer's loan, if applicable.

e. All consumer complaints and refund requests (whether received directly or indirectly, such as through a third party), and any responses to those complaints or requests.

92. Respondent must retain the documents identified in Paragraph 91 for the duration of the Consent Order.

93. Respondent must make the documents identified in Paragraph 91 available to the Bureau upon the Bureau's request.

## XIV
## Notices

**IT IS FURTHER ORDERED** that:

94. Unless otherwise directed in writing by the Bureau, Respondent must provide all submissions, requests, communications, or other documents relating to this Consent Order in writing, with the subject line, "*In re Fay Servicing, LLC*, File No. 2017-CFPB-0014," and send them either:

a. By overnight courier (not the U.S. Postal Service), as follows:

> John Schroeder
> Regional Director, Bureau Midwest Region
> Consumer Financial Protection Bureau
> 230 S. Dearborn St., Suite 1590
> Chicago, Illinois 60604

or

b. By first-class mail to the below address and contemporaneously by email to:

> John Schroeder
> Regional Director, Bureau Midwest Region
> Consumer Financial Protection Bureau
> 230 S. Dearborn St., Suite 1590
> Chicago, Illinois 60604

MidwestRegion@cfpb.gov

## XV
## Cooperation with the Bureau

**IT IS FURTHER ORDERED** that:

95.     Respondent must cooperate fully to help the Bureau determine the identity and

location of, and the amount of injury sustained by, each Affected Consumer.

Respondent must provide such information in its or its agents' possession or

control within 15 business days of receiving a written request from the Bureau.

96.     Respondent must cooperate fully with the Bureau in this matter and in any

investigation related to or associated with the conduct described in Section V.

Respondent must provide truthful and complete information, evidence, and

testimony. Respondent must cause Respondent's officers, employees,

representatives, or agents to appear for interviews, discovery, hearings, trials,

and any other proceedings that the Bureau may reasonably request upon 5 days

written notice, or other reasonable notice, at such places and times as the Bureau

may designate, without the service of compulsory process.

## XVI
## Compliance Monitoring

**IT IS FURTHER ORDERED** that, to monitor Respondent's compliance with

this Consent Order, including the financial representations upon which part of the

Respondent's redress obligation was determined:

97.     Within 14 days of receipt of a written request from the Bureau, Respondent must

submit additional Compliance Reports or other requested information, which

must be made under penalty of perjury; provide sworn testimony; or produce documents.

98. For purposes of this Section, the Bureau may communicate directly with Respondent, unless Respondent retains counsel related to these communications.

99. Respondent must permit Bureau representatives to interview any employee or other person affiliated with Respondent who has agreed to such an interview. The person interviewed may have counsel present.

100. Nothing in this Consent Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

# XVII
## Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

101. Respondent may seek a modification to non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Regional Director.

102. The Regional Director may, in his/her discretion, modify any non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) if he/she determines good cause justifies the modification. Any such modification by the Regional Director must be in writing.

# XVIII
## Administrative Provisions

103. The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau, or any other governmental agency, from taking any other action against Respondent, except as described in Paragraph 104.

104. The Bureau releases and discharges Respondent from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in Section V of this Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau may use the practices described in this Consent Order in future enforcement actions against Respondent and its affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect any right of the Bureau to determine and ensure compliance with the Consent Order, or to seek penalties for any violations of the Consent Order.

105. This Consent Order is intended to be, and will be construed as, a final Consent Order issued under section 1053 of the CFPA, 12 U.S.C. § 5563, and expressly does not form, and may not be construed to form, a contract binding the Bureau or the United States.

106. This Consent Order will terminate 5 years from the Effective Date or 5 years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order by Respondent. If such action is dismissed or the relevant adjudicative body rules that Respondent did not violate any provision of the

Consent Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Consent Order will terminate as though the action had never been filed. The Consent Order will remain effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

107. Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted.

108. Should Respondent seek to transfer or assign all or part of its operations that are subject to this Consent Order, Respondent must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

109. The provisions of this Consent Order will be enforceable by the Bureau. For any violation of this Consent Order, the Bureau may impose the maximum amount of civil money penalties allowed under section 1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondent wherever Respondent may be found and Respondent may not contest that court's personal jurisdiction over Respondent.

110. This Consent Order and the accompanying Stipulation contain the complete agreement between the parties. The parties have made no promises, representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the accompanying

Stipulation supersede any prior oral or written communications, discussions, or understandings.

111. Nothing in this Consent Order or the accompanying Stipulation may be construed as allowing Respondent, its Board, officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED**, this 6 th day of June, 2017.

Richard Cordray
Director
Consumer Financial Protection Bureau